IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF NAYOMI D. & NYEMA D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NAYOMI D. & NYEMA D., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NYACHANG D., APPELLANT.

Filed August 11, 2026.    No. A-25-678.

Appeal from the Separate Juvenile Court of Lancaster County: SHELLIE D. SABATA, Judge. Affirmed.

Nyachang D., pro se.

Christopher M. Reid, Deputy Lancaster County Attorney, for appellee.

BISHOP, WELCH, and FREEMAN, Judges.

BISHOP, Judge.

INTRODUCTION

Nyachang D. appeals pro se from the decision of the separate juvenile court of Lancaster County adjudicating her children, Nayomi D. and Nyema D., pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2024). We affirm.

BACKGROUND

Nyachang is the mother of Nayomi, born in 2014, and Nyema, born in 2022. Christian W. is Nayomi's father, and John T. is Nyema's father. The children's fathers are not part of this appeal, and they will not be discussed further.

On March 20, 2025, Nayomi disclosed to her elementary school principal, the school nurse, and then law enforcement that she had been repeatedly hit and/or punched by her mother,

- 1 -

Nyachang. Bruises were observed on Nayomi's arm, shoulder, and upper back. Law enforcement then spoke with Nyachang, and she admitted she spanked or hit Nayomi on the arm one time but denied that she had repeatedly punched her. It was ultimately determined that Nayomi and Nyema should be removed from the home for their safety.

The State filed a petition on March 24, 2025, and an amended petition on June 13, alleging that Nayomi and Nyema were children within the meaning of § 43-247(3)(a) because they lacked proper parental care by reason of the faults or habits of Nyachang, and/or the children were in a situation dangerous to life or limb, or injurious to their health or morals. The State alleged:

> a. On or about or between March 17 . . . and March 20, 2025, Nyachang . . . did strike or punch [Nayomi] . . . numerous times to various parts of her body;
>
> b. Nyachang . . . failed to provide said juveniles with a safe and stable home free of violence and/or inappropriate physical discipline;
>
> c. The actions of Nyachang . . . and/or the above situation places said juveniles at risk of harm; [and]
>
> d. All events occurred in Lancaster County, Nebraska[.]

(Emphasis omitted.) Also on March 24, the State filed a motion for ex parte temporary custody of Nayomi and Nyema, which was granted by the juvenile court that same day. The court granted the Nebraska Department of Health and Human Service temporary custody of the children. Nayomi was subsequently placed with her father, and Nyema was placed in a foster home.

A contested adjudication hearing was held on August 7, 2025. The State called four witnesses, and several exhibits were received into evidence. Nyachang did not testify in her own behalf but did call four witnesses to testify on her behalf.

Nayomi, 11 years old, testified about what had occurred at her mother's apartment in March 2025, when Nayomi was a fifth grader. She said her mother was "screaming" at her and "hit[]" her because she "got suspended" from school. Nayomi was initially standing, but then her mother "pushed" her down and "kept punching" her. Nayomi was hit on her arm, shoulder, and upper back "[m]ore than fifteen" times. After her mother was done hitting her, Nayomi "just laid down 'cause [her] arm hurt." No one else was in the apartment when the incident occurred; Nyachang's boyfriend had taken Nyema for a walk. According to Nayomi, the pictures in exhibits 5 through 8 depicted the bruises she had following the incident. Nayomi did not have school the day of the incident because it was a "snow day." When she returned to school, she told her principal and the school nurse what had happened.

Nayomi was asked if anything like that had happened before, and she responded, "Once." She said that when she was in fourth grade, her mother thought Nayomi had pushed her sister down the stairs, and her mother "started cornering" her and "started punching" her. When asked if she remembered how many times her mother hit her during that incident, Nayomi responded, "Maybe ten times."

According to Nayomi, her mother drank alcohol "almost every day." And when her mother drinks alcohol "[s]he starts screaming and crying randomly, and then she starts yelling at me saying that I did something that I didn't." Nayomi thought her mother had been drinking alcohol the day of the March 2025 incident because she "smelt it." When asked if she knew if her mother had been drinking alcohol the day of the fourth grade incident, Nayomi responded, "No."

Nayomi had never observed her mother hit Nyema.

Nayomi's elementary school principal testified that on March 20, 2025 (the day after the snow day), Nayomi was in the office and was "[q]uiet, more subdued." "She had her head down at one point and our secretary made me aware that her head was down and that she hadn't been doing her work." The principal brought Nayomi to her office and asked if she was okay, and Nayomi "became tearful" and was upset. "[Nayomi] said that . . . she was sore or hurting, something like that, and that it was making it hard for her to focus." "She continued to explain that her mother had been physical with her at home." The principal took Nayomi to the school nurse's office, called law enforcement, and then an officer came to the school; the principal also reported the incident to the "child abuse hotline." The principal observed "dark bruising up and down [Nayomi's] arm" and "some on her back." The bruising was documented "with the phone that the officer gave us." According to the principal, the pictures in exhibits 5 through 8 depicted the bruises she observed.

The elementary school nurse testified that when Nayomi came to her office on March 20, 2025, she was "quiet" and "was either sad or tired, or maybe a combination of both." Nayomi "pointed to her left shoulder and told me -- her left arm, and said that her arm hurt." The nurse stated:

> I asked her what had occurred, and she said that her shoulder hurt because her mom had struck her several times in the arm. And so, I asked her then if I could see it, and she lifted up her, just her sleeve so I could see the back of her arm, and I could see that she had visibly an area that was darkened, and then she said that she had pain there. And so, I said, I asked her when it occurred, and she said it occurred at home, that her mom held her down on the ground and punched her several times with a fist in the back and in her shoulder.

Nayomi told the nurse that she had not slept, that it was painful for her to sleep. After the law enforcement officer arrived, the nurse used the officer's phone to take pictures (exhibits 5 through 8) of the bruises on Nayomi's arm, shoulder, and upper back.

Police officer Jeffery Jacobs testified that on March 20, 2025, he was dispatched to an elementary school regarding a possible child abuse allegation. At the school, he spoke with the principal and school nurse, and he then made contact with Nayomi. Officer Jacobs observed "some extensive bruising" on Nayomi's left arm, shoulder, and upper back. He gave the nurse his department camera and asked her to take pictures of the bruises because Nayomi would have to adjust her clothing. Based on the report of what happened and his observation of Nayomi's injuries, Officer Jacobs had probable cause to believe physical child abuse had occurred.

After leaving the school, Officer Jacobs and another officer went to speak to Nyachang at her apartment. The interaction with Nyachang was recorded on the officers' body-worn cameras and the footage was received into evidence. The recordings reveal that Nyachang told Officer Jacobs, "I spanked [Nayomi] on her arm," and "I hit her on the arm" one time. However, Nyachang denied that she had held Nayomi down and punched her repeatedly, and she denied knowing how Nayomi's bruises occurred. The officers left after telling Nyachang that further investigation was needed.

Officer Jacobs testified that Nyachang was ultimately arrested for felony child abuse in April 2025.

Nyachang called four witnesses to testify on her behalf--Nyema's paternal aunt, Nyema's paternal grandmother, Nyema's paternal great-grandmother, and Nyachang's live-in boyfriend. The witnesses generally testified that Nyachang was a loving mother, they never observed any concerning bruises on the girls, and they never had concerns about the girls' safety.

In its order filed on August 19, 2025, the juvenile court found that Nayomi's testimony was credible and provided "the only explanation for the injuries that are clearly visible in the photographs received in evidence." The court found by a preponderance of the evidence that the allegations in the amended petition were true and that Nayomi and Nyema were children within the meaning of § 43-247(3)(a). The court adjudicated the children accordingly. A disposition hearing was set for September 17.

Nyachang appeals.

## ASSIGNMENTS OF ERROR

Nyachang assigns, consolidated and restated, that (1) the juvenile court erred in finding that there was sufficient evidence to adjudicate her children pursuant to § 43-247(3)(a), (2) she was denied the effective assistance of counsel because her counsel rested without consulting her about her right to testify, and (3) her due process rights were violated because she was not given a meaningful opportunity to be heard.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022).

However, the State asks this court to either dismiss Nyachang's appeal or consider the appeal under a plain error review because (1) Nyachang failed to comply with the service requirement outlined in the Nebraska Rules of Appellate Practice and (2) Nyachang's brief does not include all of the required sections. More specifically, Nyachang failed to file a certificate of service with her brief, and there is nothing to show that she served her brief upon the State. See, Neb. Ct. R. App. P. § 2-109(A)(1)(b) (rev. 2021) (appellant's brief must be served and filed 30 days after date bill of exceptions is due to be filed); Neb. Ct. R. App. P. § 2-103(B)(2) (rev. 2021) (service of copy of brief shall be made either on opposing party or attorney of record for party and upon all other parties participating in appeal); § 2-103(C)(6) (all briefs, together with proof of service, shall be filed with appellate court on or before date brief is due). The State claims it was "not aware [Nyachang] filed [her] appeal brief until this Court informed the State their response brief was due in ten (10) days." Brief for appellee at 19. And, as noted by the State, Nyachang's brief fails to conform to the requirements of § 2-109(D)(1) (setting forth sections to be included in appellant's brief, order of sections, and information to be included in each section). Her brief "fails to establish that this Court has jurisdiction over the appeal by failing to include a statement of jurisdiction or an adequate statement of the case," and is "missing a table of contents, table of authorities, and a summary of the argument as required under this Court's rules." Brief for appellee

at 17. We note that Nyachang's brief is also missing a statement of facts as required by § 2-109(D)(1).

Parties who wish to secure appellate review must abide by the rules of the Nebraska Supreme Court, and those who fail to comply with the appellate briefing rules do so at their own peril. *Kellogg v. Mathiesen*, 320 Neb. 223, 26 N.W.3d 651 (2025). See, also, *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant held to same standards as one who is represented by counsel). When a party fails to follow the rules of the Nebraska Supreme Court, an appellate court may proceed as though the party had failed to file a brief or, alternatively, may examine the proceedings for plain error. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). See, also, *City of Gordon v. Montana Feeders, Corp.*, 273 Neb. 402, 730 N.W.2d 387 (2007) (failure of party to submit brief which complies with court rules may result in court treating case as one in which no brief has been filed by that party); *In re Interest of Luis D.*, 29 Neb. App. 495, 956 N.W.2d 25 (2021) (when party's brief fails to comply with § 2-109(D)(1), court may proceed as though party failed to file brief or, alternatively, examine proceedings for plain error). Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *In re Interest of Luis D., supra*.

We exercise our discretion to examine the proceedings for plain error.

ANALYSIS

SUFFICIENCY OF EVIDENCE

The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Xandria P., supra*. The parents' rights are determined at the dispositional phase, not at the adjudication phase. *Id.*

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). Section 43-247(3)(a) outlines the basis for the juvenile court's jurisdiction and grants exclusive jurisdiction over any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" or "who is in a situation . . . dangerous to life or limb or injurious to the health or morals of such juvenile."

The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. *In re Interest of Kane L. & Carter L., supra*. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* The State must prove such allegations by a preponderance of the evidence. *Id.*

We find no plain error in the juvenile court's adjudication of Nayomi and Nyema as children within the meaning of § 43-247(3)(a). Nayomi testified that her mother hit her on her arm, shoulder, and upper back "[m]ore than fifteen" times, and that exhibits 5 through 8 depicted the bruises she had following the incident. Officer Jacobs described Nayomi's bruises as "extensive." And Nyachang admitted to law enforcement that she hit Nayomi, although she claimed she only

did so one time. Even though there was no evidence that Nyema had actually suffered physical harm, the juvenile court orally found that

> this form of discipline or physical abuse of one child in the home does place all children at risk of harm under this Court's, basically, training and experience, especially when the younger, the other child is a younger, more vulnerable child with a lesser ability to be able to advocate and protect themselves or report these kinds of incidents as Nayomi did.

The juvenile court's finding that Nyema was also at risk of harm did not constitute plain error.

### EFFECTIVENESS OF COUNSEL AND DUE PROCESS

Nyachang claims that she was denied the effective assistance of counsel because her counsel "rested without calling [her] to testify and without meaningful consultation regarding her right to do so," and that she "was advised in a confusing manner that testifying would 'look good and bad,' and counsel proceeded to rest the case." Brief for appellant at 7. Nyachang further claims that "[b]y resting the case without permitting [her] to testify, the proceeding deprived [her] of a full and fair opportunity to be heard," violating her right to due process. *Id.* at 8.

The Nebraska Supreme Court has addressed a parent's right to the effective assistance of counsel in juvenile proceedings. In a case involving the termination of parental rights, it stated that juvenile proceedings are civil rather than criminal in nature and that an individual has no constitutional right to effective assistance of counsel in a civil proceeding. See *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003). It has also concluded that ineffective assistance of counsel is not an available claim in a juvenile adjudication proceeding in which counsel was appointed for the parents pursuant to statute and where counsel was not required under the federal Constitution. See *In re Interest of Heather R. et al.*, 269 Neb. 653, 694 N.W.2d 659 (2005). However, due process is required. See, *id.*; *In re Interest of Joshua R. et al., supra*. See, also, *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004) (parents are entitled to due process in adjudication proceedings).

In the context of both adjudication and termination hearings, the Nebraska Supreme Court has stated that

> "[p]rocedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decision maker."

*In re Interest of Mainor T. & Estela T.*, 267 Neb. at 247-48, 674 N.W.2d at 457 (quoting *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003)). See, also, Neb. Rev. Stat. § 43-279.01 (Reissue 2016) (rights afforded to parents when petition alleges juvenile to be within the provisions of § 43-247(3)(a), including the "[r]ight to remain silent as to any matter of inquiry if the testimony sought to be elicited might tend to prove the party guilty of any crime" and the "[r]ight to testify and to compel other witnesses to attend and testify"). According to the juvenile

court's order entered on March 26, 2025, the court explained Nyachang's rights to her at a hearing that day.

Despite Nyachang's claim that she was not permitted to testify at the adjudication hearing, there is nothing in the record to support her claim. And any discussions between Nyachang and her counsel about whether she would testify at the adjudication hearing do not appear in our record. However, during closing arguments, Nyachang's counsel stated:

> The only two people who can tell the Court exactly what happened in this incident are Nayomi and [Nyachang]. [Nyachang] is in a very difficult position because she, with pending criminal charges, is not in a position to tell the Court what happened, and so with Nayomi being the only witness that is for the Court to determine if that is sufficient evidence.

(Emphasis supplied.) The State contends that "[c]ounsel's statements imply that [Nyachang] chose to invoke her statutory right to remain silent," and "[t]his inference is further supported when [Nyachang] concedes in her brief that counsel advised her as to the good and bad consequences of testifying." Brief for appellee at 29. We agree with the State.

The record reflects that Nyachang was represented by counsel and had notice and an opportunity to be heard at the adjudication hearing held before an impartial decision maker. Nyachang, through her counsel, confronted and cross-examined the State's witnesses, and called four witnesses to testify on her behalf. We find no violation of Nyachang's due process rights in the record before us.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's August 19, 2025, order adjudicating Nayomi and Nyema to be children within the meaning of § 43-247(3)(a).

AFFIRMED.